# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

WENDOLYN CREASE, )
 )
       Plaintiff, )
 )
vs. ) Case No. 12-2304-JAR
 )
CITY OF OLATHE, KANSAS, et al., )
 )
       Defendants. )
 )

## MEMORANDUM AND ORDER

Plaintiff Wendolyn Crease brings this action under 42 U.S.C. § 1983 and Kansas law, alleging that Defendants, City of Olathe Police Officers, stopped her vehicle and subjected her to sobriety tests in violation of the Fourth, Fifth, and Fourteenth Amendments[1] and that she was racially profiled. This case is before the Court on Defendants' Motion for Summary Judgment (Doc. 38) and Plaintiff's cross-motion for summary judgment (Doc. 44). As explained in detail below, because Plaintiff cannot show that Defendants violated a clearly established constitutional right, the motion for summary judgment must be granted on the federal civil rights claims. The Court declines to exercise supplemental jurisdiction over the remaining state law claim.

**I.    Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is "no

---

[1]Although the Pretrial Order (Doc. 33) lists violations of several constitutional rights, Plaintiff's Response to Summary Judgment (Doc. 44) clarifies that her § 1983 action is not a "constitutional racial-based claim," and limits discussion and analysis to allegations that Defendants violated her Fourth Amendment right to be free from unreasonable searches and seizures.

1

genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[2] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[3] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[4] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5] An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[6]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[7] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[8]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to

---

[2]Fed. R. Civ. P. 56(a).

[3]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[4]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[5]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[6]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[7]*Spaulding v. United Trasp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[8]*Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

"set forth specific facts showing that there is a genuine issue for trial."[9] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[10] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[11] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[12] Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[13] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[14]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[15] In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[16]

---

[9]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[10]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[11]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[12]*Adams*, 233 F.3d at 1246.

[13]Fed. R. Civ. P. 56(c)(4).

[14]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[15]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[16]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

Plaintiff moves for summary judgment as part of her response to Defendants' motion, filed on April 19, 2013. The dispositive motions deadline was March 15, 2013.[17] Plaintiff did not file her motion by this deadline, nor has she sought leave to file her motion for summary judgment out of time. Accordingly, Plaintiff's motion was improvidently filed and may be denied on this basis alone. But even assuming the motion was properly filed, the Court would deny her motion on the merits for the reasons explained herein.

## II.     Facts

The following facts are either uncontroverted or stated in the light most favorable to the nonmoving party.

Plaintiff Wendolyn Crease is an African-American woman. She was diagnosed with glaucoma in both eyes in the early 2000s, which causes her eye pain, blurred vision, and sensitivity to light. The glaucoma also causes a cloud over her vision in the center of her eyes. Defendants Justin Hays and Robert McKeirnan are members of the City of Olathe, Kansas Police Department, and were acting under the color of state law at the time of the incident forming the basis of this action.

Plaintiff spent the night at her sister's house on South Walnut, in Olathe, Kansas the night of August 14, 2010. She was not feeling well that night and had recently had tubes inserted into the tear ducts of her eyes to produce moisture. Although she uses prescription glasses when driving, she left them at home that night. Plaintiff believes she went to bed around 10:30 or 11:00 p.m., and took sleep medication to help her sleep. She recalls waking up around 3:30 or 4:00 a.m. because she wanted to go home to eat something so she could take her morning

---

[17]Doc. 33 at 14.

medication. Plaintiff left her sister's house around 4:15 a.m., and was driving a black Mazda 626.

At 4:35 a.m., Officers Hays and McKeirnan were dispatched following a 911 call from a citizen complaining of a vehicle driving slowly up and down a residential street in the area of Troost Circle and Prairie Street in Olathe, Kansas. The vehicle was described as a black, newer four-door passenger car with a Missouri license tag, possibly a Saab or Volkswagen. The citizen report did not identify the race or gender of the person operating the vehicle. While the officers were heading to the area, dispatch updated the vehicle description to say that it had Kansas tags, had loud music coming from it, and was last seen leaving the area on Prairie Street.

Plaintiff testified at her deposition that while she was getting into her car in front of her sister's house, she saw two police vehicles turn off Santa Fe, heading northbound on Walnut. Her sister's house is approximately three blocks south of Santa Fe. Plaintiff then got in her car and from her sister's house drove north on Walnut, crossed over Santa Fe, and stopped at the stop sign at Spruce. Plaintiff testified that one of the police vehicles made a U-turn immediately north of the intersection of Walnut and Spruce, and stopped at the stop sign at the intersection, such that she was facing northbound and the police vehicle was facing southbound. Plaintiff testified that she and the police vehicle sat at the stop sign for twenty-five to thirty seconds facing each other, and that the officer "looked at me," and she was "pretty sure, he saw her."

Plaintiff put on her turn signal and made a right-hand turn heading east on Spruce. Officer Hays followed Plaintiff's vehicle for several blocks on Spruce. Hays avers that he observed the vehicle was a black Mazda four-door with a Kansas tag that generally matched the description of the vehicle identified in the citizen report. He further observed the vehicle driving

5

at a speed of 10-20 mph, below the posted speed limit of 25 mph, and weaving slightly but steadily within its lane of traffic. Plaintiff turned left, heading north on Woodland, and Hays activated his emergency lights. Plaintiff pulled over at the corner of Prairie Street and Woodland, with the back end of her car still within the intersection.

Officer Hays got out of his car and approached the driver's side of Plaintiff's vehicle. He asked Plaintiff if she was coming from Troost, and she replied, "off of who?" and "why would I be coming off Troost?" Hays then told Plaintiff that he was responding to a complaint about a car fitting the description of her vehicle that was driving around near Troost playing loud music. Plaintiff denied that she listened to music. Hays attempted to observed Plaintiff's eyes because she was looking straight ahead while talking with him instead of directly at him. When Plaintiff turned towards him, he shined his flashlight in her eyes, and she told him it hurt her eyes. Hays noticed Plaintiff's eyes were watery and bloodshot and asked her if she had been drinking alcohol, and she denied doing so. Hays then attempted to get Plaintiff to follow his finger with her eyes in order to gain more information as to whether or not she was impaired. Instead, Plaintiff accused Hays of harassment and continued to ask why she had been stopped.

Officer Hays had been trained that watery, bloodshot eyes that are sensitive to light are indicators of potential drug or alcohol impairment, and decided to conduct a field sobriety test. Officer McKeirnan arrived after Plaintiff's vehicle had been stopped. Hays asked Plaintiff to turn off her car. Instead, she picked up her phone and told someone she was talking to on the other end to "call Fox 4." Plaintiff's vehicle was still in gear, and McKeirnan opened the passenger door, put it in "park," turned off the ignition, and took the keys out of the ignition. Hays asked Plaintiff to get out of the vehicle, and she did so. Hays explained that he could not

let her drive with the suspicion that she had been drinking alcohol. He asked her to open her mouth to determine whether there as anything in it that would affect the test. He then put Plaintiff through a number of field sobriety tests, including the Horizontal Gaze Nystagmus test, the one leg stand, and a Preliminary Breath Test. When Plaintiff complained that she was having problems with the tests because of her health condition, Hays stated he was "willing to let [her] bypass it and if you can't do it, you can't do it, just let me know what you want to do." Plaintiff continued with the tests, Hays determined she was not impaired, and released her to go home.

Plaintiff asked for and received the officers' badge numbers. She was not handcuffed, patted down or otherwise touched during the stop. Neither officer conducted a search of the interior of Plaintiff's vehicle. The total contact between the officers and Plaintiff was approximately twenty-five minutes.

On August 16, 2010, Plaintiff went to the Olathe Police Department and filled out a Report of Complaint. On August 17, 2010, she filed a complaint with the Kansas Human Rights Commission alleging racial profiling. Plaintiff served the City of Olathe with a Notice of Claim dated December 16, 2011, alleging damages totaling $300,000.

## III. Discussion

### A. Section 1983

Defendants move for summary judgment on the Fourth Amendment claim against Officers Hays and McKeirnan in their individual capacities. Defendants argue that Plaintiff cannot demonstrate a constitutional violation and that they are entitled to qualified immunity. Plaintiff counters that Defendants clearly violated her Fourth Amendment rights and that she is entitled to judgment as a matter of law on her claim.

When a qualified immunity defense has been raised on summary judgment, the plaintiff must demonstrate that (1) the defendant's actions violated a constitutional or statutory right, and (2) the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue and under the circumstances in question.[18] The court may decide the appropriate order to consider these issues.[19] If plaintiff makes this showing then the burden shifts back to the defendant to demonstrate that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.[20] "A qualified immunity defense will not succeed [upon summary judgment] . . . when the facts considered collectively present an incomplete picture of the relevant circumstances."[21]

Qualified immunity protects public officials performing discretionary functions unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."[22] Qualified immunity leaves "ample room for mistaken judgments," protecting "all but the plainly incompetent or those who knowingly violate the law."[23] "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[24]

---

[18] *See Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011), *cert. denied*, 133 S. Ct. 211 (2012).

[19] *Camreta v. Greene*, 131 S. Ct. 2020, 2031–32 (2011).

[20] *Id.*

[21] *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002) (quotation omitted).

[22] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[23] *Malley v. Briggs*, 475 U.S. 335, 341 & 343 (1986).

[24] *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

In determining whether the plaintiff has met her burden of establishing a constitutional violation that was clearly established, a court construes the facts in the light most favorable to the plaintiff as the non-moving party.[25] "[T]his usually means adopting . . . the plaintiff's version of the facts," unless that version "is so utterly discredited by the record that no reasonable jury could have believed him."[26] The Court has reviewed the videotape recording and transcripts submitted by the parties and finds that they do not blatantly contradict Plaintiff's version of the events surrounding the traffic stop on August 14, 2010.[27]

Plaintiff claims Defendants violated her Fourth Amendment rights because the initial stop of her vehicle was invalid, the duration of the initial stop was unreasonable, she was subjected to a search without her consent, and she was forced to undergo a field sobriety test. The Court considers each claim in turn.

### *Type of Encounter/Level of Suspicion*

The Fourth Amendment protects "[]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[28] It is well established that "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."[29]

---

[25] *Scott v. Harris*, 550 U.S. 372, 378–80 (2007); *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) (noting that the Tenth Circuit "accept[s] the facts as the plaintiff alleges them").

[26] *Scott*, 550 U.S. at 378, 380. In *Scott*, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of events. *Id*. at 379.

[27] Doc. 39, Ex. C.

[28] U.S. Const. amend. IV.

[29] *Whren v. United States*, 517 U.S. 806, 809-10 (1996).

> The Tenth Circuit has defined three types of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.[30]

Plaintiff asserts that she considered herself to have been arrested, and contends that Defendants illegally seized and searched her person and property without probable cause or reasonable suspicion to do so. The Court analyzes the encounter between Plaintiff and the officers from its inception and determines whether the requisite level of suspicion existed at each stage.[31]

### *Initial Stop*

Law enforcement officers may stop and briefly detain a person for investigative reasons if the officer has a reasonable suspicion that criminal activity may be afoot.[32] Reasonable suspicion requires a "particularized and objective basis for suspecting the particular person stopped of criminal activity."[33] Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.[34]

---

[30]*United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007) (internal quotation omitted).

[31]*Id.* at 945.

[32]*United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001) (explaining that "while either probable cause or reasonable suspicion is sufficient to justify a traffic stop, only the lesser requirement is necessary.").

[33]*United States v. Cortez*, 449 U.S. 411, 417-18 (1981). By contrast, "[p]robable cause to arrest exists if the facts and circumstances within the officer's knowledge are sufficient to justify a prudent officer in believing the defendant committed or is committing an offense." *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007).

[34]*United States v. Arvizu*, 534 U.S. 266, 274 (2002).

Under *Terry*, the court applies a two-step inquiry to assess the constitutionality of a traffic stop and determine (1) "whether the officer's action was justified at its inception," and, if so, (2) "whether the resulting detention was reasonably related in scope to the circumstances that justified the stop in the first place."[35] The police officer's subjective reason for stopping a vehicle is irrelevant in determining whether the driver's Fourth Amendment rights were violated.[36]

Plaintiff argues that Defendants had no probable cause or reasonable suspicion to believe that she committed a traffic violation, and thus the initial stop was invalid. The initial stop, however, was based on Plaintiff's vehicle matching the description of the vehicle that law enforcement was looking for after the officers were dispatched following a 911 call from a citizen complaint. "A confidential tip may justify an investigatory stop if under the totality of the circumstances the tip furnishes both sufficient indicia of reliability and sufficient information to provide reasonable suspicion that criminal conduct is, has, or is about to occur."[37] The determination of "'[w]hether a tip provides reasonable suspicion to make a traffic stop is case-specific,'" and no single factor is dispositive.[38] Relevant factors include: (1) whether the informant lacked "true anonymity" (i.e., whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported contemporaneous,

---

[35] *United States v. Davis*, 636 F.3d 1281, 1290 (10th Cir. 2011) (quotation omitted).

[36] *Whren v. United States*, 517 U.S. 806, 812-13 (1996).

[37] *United States v. Madrid*, 713 F.3d 1251, 1257 (10th Cir. 2013) (quotation omitted).

[38] *Id*. (quoting *United States v. Chavez*, 660 F.3d 1215, 1222 (10th Cir. 2011)).

11

firsthand knowledge; (3) whether the informant provided detailed information about the events observed; (4) the informant's stated motivation for reporting the information; and (5) whether the police were able to corroborate information provided by the informant.[39]

In this case, the caller was a concerned citizen witnessing a situation in public view that he thought was a crime or about to be a crime, who then reported the disturbance to the authorities.[40] The citizen who called 911 was not anonymous, as he gave his name and telephone number to dispatch.[41] All of the other factors considered to determine whether the tip provides reasonable suspicion support the caller's reliability. The caller was reporting contemporaneous, firsthand knowledge of the vehicle driving slowly up and down a residential street, driving up on the caller's circle drive, playing loud music, in a specific area of Olathe, Kansas. The caller provided detailed information about the events he was observing, including describing the vehicle as a black, newer four-door passenger car with Kansas tags. The caller's motivation for calling 911 appears to be a concern that the occupant[s] of the vehicle was casing houses in his neighborhood late at night. Finally, the officers dispatched in response to the call were able to verify the information the caller had provided. Although there was no loud music coming from Plaintiff's car, Officer Hays did identify the vehicle as matching the caller's description, driving at a slow rate of speed, and coming from the general area described, at a time of night when few

---

[39]*Id*; *accord United States v. Copening*, 506 F.3d 1241, 1247 (10th Cir. 2007) (considering these factors and concluding information from unidentified 911 caller was sufficiently reliable to establish reasonable suspicion); *United States v. Brown*, 496 F.3d 1070, 1078-79 (10th Cir. 2007) (same).

[40]*See Madrid*, 713 F.3d at 1261 (distinguishing between tips regarding clandestine crimes such as possessory offenses, which may require corroboration of the extent of the tipster's inside information to ensure knowledge of the alleged illegal conduct) (collecting cases).

[41]Doc. 39, Ex. C at 8-10.

cars are on the road.

Thus, the Court concludes, considering the totality of the circumstances, that the 911 call bore "sufficient indicia of reliability to provide reasonable suspicion to make the investigative stop" of Plaintiff. The 911 call, directive from dispatch, and corroborated facts provided Officer Hays with a particularized and objective basis for suspecting Plaintiff had just been involved in criminal activity. Accordingly, the investigative stop was justified at its inception and was not in violation of the Fourth Amendment.

### *Duration of the Stop*

Plaintiff next argues that Defendants violated her rights under the Fourth Amendment by expanding the scope of the initial stop without reasonable suspicion or probable cause, and that she should have been free to leave after she told Officer Hays that she was not playing loud music from her car, nor had she been drinking. Plaintiff is correct that "'[i]f a police-citizen encounter exceeds the limits of a *Terry* stop, the detention becomes an arrest and must be supported by probable cause.'"[42] Thus, the Court examines whether the duration of the initial stop was unreasonable under *Terry's* second prong.

In general, an investigative detention complies with the second prong if it "last[s] no longer than is necessary to effectuate the purpose of the stop."[43] At a stop, an officer may "request a driver's license, registration, and other required papers, run requisite computer

---

[42]*Chavez*, 660 F.3d at 1223 (quoting *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1227 (10th Cir. 2008)).

[43]*Amundsen v. Jones*, 533 F.3d 1192, 1199 (10th Cir. 2008) (quoting *United States v. Millan-Diaz*, 975 F.2d 720, 721 (10th Cir. 1992)) (quotation marks omitted).

13

checks, and issue citations or warnings as appropriate."[44]  Initially, "an officer may ask questions, whether or not related to the purpose of the traffic stop, if they do not excessively prolong the stop."[45]  If a stop is prolonged beyond the time reasonably required to complete" its purpose, it can become unlawful.[46]  Consequently when the purpose of the stop is completed, typically a driver must "be allowed to proceed on his way without further delay by the law enforcement officer for additional question."[47]

But an officer may detain a driver beyond the scope of the traffic stop if, during the stop, "(1) the officer develops an objectively reasonable and articulable suspicion that the driver is engaged in some illegal activity, or (2) the initial encounter becomes a consensual encounter."[48]  To determine whether an officer has a reasonable suspicion to detain beyond the scope of the traffic stop, the Court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing."[49]  "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."[50]

---

[44]*United States v. Kitchell*, 653 F.3d 1206, 1217 (10th Cir. 2011).

[45]*Id.*

[46]*United States v. Davis*, 636 F.3d 1281, 1290 (10th Cir. 2011).

[47]*United States v. Wisniewski*, 192 F. App'x 749, 745 (10th Cir. 2006).

[48]*Davis*, 636 F.3d at 1290 (quoting *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004)) (quotation marks and alterations omitted).

[49]*United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotations omitted).

[50]*Id.* (quotation omitted).

In this case, Officer Hays' suspicion that Plaintiff was impaired was based upon her slow speed and weaving between lanes, her indirect answer to her route of travel, her failure to look at him directly when answering his questions, his observation that her eyes were watery and bloodshot, her sensitivity to light when he shined the flashlight in her direction, and her continued questioning of why she had been stopped when Hays attempted to get her to follow his finger with his eyes. Thus, Hays had an articulable suspicion that Plaintiff was impaired based on her behavior and appearance both before and during the stop. Hays' use of the standard roadside field sobriety tests in order to confirm or dispel his reasonable suspicion of impairment did not exceed the scope of the stop.[51] Once she completed the tests, Hays determined that Plaintiff was not impaired, and she was released. The entire encounter took approximately twenty-five minutes, and did not escalate into an arrest.

Plaintiff's attempt to create a fact issue by asserting that she was not cited for a traffic violation and that there are better indicators of impairment than watery or bloodshot eyes is unavailing, as reasonable suspicion does not require absolute certainty of a crime.[52] Moreover, even if the Court accepts Plaintiff's assertions as true and assumes that she was not driving slowly or weaving, the other indicators involving her behavior and appearance after the stop are sufficient to establish reasonable suspicion. And, finally, Plaintiff's claim of pretext fails, as the inquiry regarding whether reasonable suspicion exists does not consider the subjective motives

---

[51]*See Wilder v. Turner*, 490 F.3d 810, 815 (10th Cir. 2007) ("A field sobriety test is a minor intrusion on a driver only requiring a reasonable suspicion of intoxication and an easy opportunity to end a detention before it matures into an arrest.").

[52]*See United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004) ("[A]s long as an officer has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is not involved in any illegality.").

of a police officer.[53] Accordingly, Plaintiff has failed to establish a Fourth Amendment violation with respect to the duration of the stop.

*Alleged Search of Plaintiff and Vehicle*

It is undisputed that at no time during the encounter with Plaintiff did the officers ever conduct a pat-down of or otherwise touch her body. Nevertheless, Plaintiff contends that Officer Hays "searched" her person without her consent when he required her to open her mouth so that he could shine a light in it. The Fourth Amendment governs intrusions into the human body, which constitute searches and are forbidden unless they are justified in the circumstances and made in the proper manner.[54] As part of the field sobriety test, Hays asked Plaintiff to open her mouth to see if she had gum or anything in her mouth that would affect the test. As previously discussed, Hays had reasonable suspicion that Plaintiff was impaired and his use of standard field sobriety tests was justified. Hays did not touch Plaintiff or insert anything into her mouth to view it better. Under these circumstances, looking inside Plaintiff's mouth with his flashlight was incident to those tests, and did not constitute an unreasonable search.

Plaintiff further contends that Officer McKeirnan "searched" her vehicle when he opened the passenger door, placed the gear into "park," shut off the engine and removed her keys. To the extent McKeirnan's actions constituted a search, they were also reasonable under the circumstances. Despite being directed to do so by Officer Hays, Plaintiff failed to place her vehicle in "park" during the traffic stop. Because the engine was still running, this placed

---

[53]*United States v. Botero-Spina*, 71 F.3d 783, 787 (10th Cir. 1995).

[54]*See Cook v. Olathe Med. Center, Inc.*, 773 F. Supp. 2d 990, 1001 (D. Kan. 2011) (citing *Schmerber v. California*, 384 U.S. 757, 768 (1966)) (discussing compulsory blood and urine tests).

16

Defendants in the position of risking Plaintiff driving away during the stop, and McKeirnan's actions and seizure of the keys was reasonably necessary to protect the officers' personal safety and to maintain the status quo during the course of the traffic stop.[55]

### *Field Sobriety Tests*

Finally, Plaintiff asserts that she was forced to undergo the field sobriety tests, despite her objections and in violation of her constitutional rights. In support of her claim, Plaintiff cites to the entire In-Car Video Transcript from the night in question. Review of the transcript, however, reveals that after Plaintiff complained of difficulty completing some of the tests because of her physical ailments, Officer Hays offered her the alternative of not taking the test if she could not physically do so.[56] Instead, Plaintiff agreed to continue, and successfully completed the test.[57] Thus, the record does not support Plaintiff's assertion that she was forced to undergo the field sobriety tests.[58]

Accordingly, the Court concludes that Plaintiff has failed to demonstrate that Officers Hays and McKeirnan violated her Fourth Amendment rights, and Defendants are entitled to qualified immunity on Plaintiff's § 1983 claim.

---

[55] *See United States v. Roberts*, 572 F. Supp. 2d 1240, 1248 (D. Kan. 2008) (citing *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002)) (explaining that "[s]ince police officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of a [Terry] stop.'" (quotation omitted).

[56] Doc. 39, Ex. 3 at 18-20.

[57] *Id.* at 20.

[58] The Court notes that, had Plaintiff refused or declined to participate in the field sobriety tests, her lawful detention would likely have developed into probable cause to arrest her for driving under the influence. *Wilder v. Turner*, 490 F.3d 810, 815 (10th Cir. 2007).

**B.     State Law Claim**

Because the Court has dismissed Plaintiff's federal claim over which it had original jurisdiction, it is authorized to decline supplemental jurisdiction over the remaining state law claim of racial profiling brought under K.S.A. § 22-4611.[59]  Whether to exercise supplemental jurisdiction is committed to the court's sound discretion.[60]  28 U.S.C. § 1367 "reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness and comity.'"[61]

"[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."[62]  In this case, Plaintiff's state law claim for racial profiling is closely intertwined with the § 1983 claim; all of Plaintiff's claims stem from the traffic stop in August 2010.   This weighs against the exercise of supplemental jurisdiction over her state law claim.[63]  The Court therefore declines to exercise jurisdiction over Plaintiff's state law claim.

---

[59]28 U.S.C. § 1367(c)(3).

[60]*City of Chicago  v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73 (1997); *see also Anglemyer v. Hamilton Cnty. Hosp.*, 58 F.3d 533, 541 (10th Cir. 1995).

[61]*City of Chicago*, 522 U.S. at 173 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)); *see also Gold v. Local 7 United Food & Commercial Workers Union*, 159 F.3d 1307, 1310 (10th Cir. 1998), *overruled on other grounds by Styskal v. Weld Cnty. Commr's*, 365 F.3d 855 (10th Cir. 2004).

[62]*Carnegie-Mellon Univ.*, 484 U.S. at 357.

[63]*Smith v. City of Enid*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").

**IT IS THEREFORE ORDERED BY THE COURT THAT** Defendants' Motion for Summary Judgment (Doc. 38) is GRANTED on the issue of qualified immunity, and Plaintiff's Cross-motion for Summary Judgment (Doc. 44) is DENIED; the Court declines to exercise supplemental jurisdiction over the remaining state law racial profiling claim, which shall be dismissed, without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

**IT IS SO ORDERED.**

Dated: September 20, 2013

                                         S/ Julie A. Robinson
                                         JULIE A. ROBINSON
                                         UNITED STATES DISTRICT JUDGE